### JOSEPH A. INGALLS *vs.* CORA I. NEWHALL.

Essex. Nov. 6, 1884. — May 14, 1885. COLBURN, J., absent.

A deed, which described the grantors and grantees as the heirs at law of E., released and quitclaimed a lot of land on the north side of a street, describing it by metes and bounds, being the same premises conveyed to E. by a certain deed, " 'ogether with all our right, title, and interest in the land between said lot and the sea, lying on the southerly side of said street. The said E. died seised of said estate." At the time of his death, E. was seised of the lot first described in the deed, and of an undivided interest in a large tract of land on the southerly side of the street, which tract embraced land not only directly in front of the lot on the north side of the street, but east and west of that land. One of the grantors, at the time the deed was executed, held, as heir of E., an undivided fortieth part in the lot north of the street and in the tract south of it, and also, by an independent title, an undivided fifth part in the tract south of the street. *Held*, that the deed included the entire tract south of the street, and not merely the part directly in front of the lot on the north side of the street. *Held, also*, that as to this tract only the title which the grantors had therein as heirs passed; and that the independent title of the grantor mentioned did not pass.

One tenant in common of a tract of land bordering upon the sea enclosed a portion by a bank wall, and placed upon a part of it a fish-house, not fastened to the soil, and susceptible of easy removal, and a pump. He afterwards let the fish-house, receiving rent therefor, paid taxes on the house, but not, *eo nomine*, on the land. The other tenants in common used the fish-house as they found it convenient to do so. The pump was used as a common convenience by the neighborhood; and the land thus enclosed was used as a place of common resort for smoking and conversation, and as a place where all might draw up their boats. *Held*, that such use and occupation, even if continued for twenty-nine years, would not amount to an ouster of the cotenants.

WRIT OF ENTRY, dated August 11, 1883, to recover a parcel of land in Lynn, bounded northerly by the southerly line of Humphrey Street, about three hundred and forty-two feet, and southerly by the sea. Plea, *nul disseisin*, with a specification of defence that the tenant disclaimed title to four undivided

fifths of the demanded premises, excepting two parcels, the first being a parcel "on which stands a wooden frame for boats," about eighteen and a half feet long and eleven feet wide; and the second, " a parcel of land with the building and pump and platform thereon, . . . . a portion of which parcel is under a double boat-house, and the remainder is enclosed by a stone bank wall," the location of both parcels being particularly described.

Trial in the Superior Court, before *Aldrich,* J., who directed a verdict for the demandant; and reported the case for the consideration of this court. The facts appear in the opinion.

*D. E. Ware,* for the tenant.

*W. Gaston & C. L. B. Whitney,* for the demandant.

DEVENS, J. John Ingalls, whose will was admitted to probate in 1848, died seised of two tracts of land, one on the northerly and the other on the southerly side of Humphrey Street. He devised the same, with his other real estate, to his five sons. On June 14, 1849, the tract on the northerly side was divided by mutual deeds into four parts, one each to three of the sons of John Ingalls, namely, Ephraim, Joseph, and Otis Ingalls, and one to the heirs of his son Benjamin, who died after his father. The fifth son, Jonathan B., while he participated in this division, received no part of the land thus divided. The case affords no evidence that there was any division of the land lying on the southerly side of Humphrey Street.

In this action the demandant claims seisin and possession of the whole of the last-named tract. The tenant claims title in severalty to certain small, described parcels, through the adverse possession, for more than twenty years, of herself and her predecessors in title, or under lost deeds; and in the whole of the locus she claims to hold one fifth as tenant in common with the demandant.

In dealing with the questions thus presented, it will be more convenient first to determine whether the tenant has title to one undivided fifth of the demanded premises. She is the sole heir of Ephraim A. Ingalls, who died in 1882, and to whom Joseph Ingalls, in 1863, devised all his real estate. It is not disputed that the tenant now holds one undivided fifth in the demanded premises, unless the same was included in a deed made in 1875,

by Ephraim A. Ingalls. In this deed Ephraim A. and four others, " the same being, with the grantees in this deed, all the heirs at law of Ephraim Ingalls," released and quitclaimed to the demandant and two others, a lot of land on the northerly side of Humphrey Street, and having a frontage of seventy-eight feet on that street, describing it by metes and bounds, " being the same premises conveyed to said Ephraim Ingalls by Otis Ingalls and others, by deed dated June 14, 1849, . . . . together with all our right, title, and interest in the land between said lot and the sea, lying on the southerly side of said Humphrey Street. The said Ephraim Ingalls died seised of said estate."

At the time when this deed was made, (all the title or rights under which have since been acquired by the demandant,) Ephraim A. Ingalls held in the locus one fifth, or eight fortieths, as devisee of Joseph Ingalls, and one fortieth as one of his father's eight heirs. He had also such rights, if any, as Joseph might have acquired to the parcels claimed by the tenant in severalty.

The demandant contends that all the right and title which Ephraim A. then had in this locus, whether to the several parcels or to the undivided portion devised to him by Joseph, passed by this deed. This is to give to the deed much too broad à construction. Its whole frame shows that it was intended to convey the tract on the northerly side of Humphrey Street, together with the share and interest which the grantors had in the tract upon the south side, which they derived from their father, Ephraim, as his heirs. If this intention is fairly shown, too much stress should not be laid upon particular words or expressions, which, but for this, might import a different purpose. The grantors describe themselves as being with the grantees " all the heirs at law of Ephraim Ingalls," refer to a division made between him and his brothers, the sons of John Ingalls, and convey the tract set off to their father thereby, and then their right, title, and interest in the land on the southerly side of the street. This must mean their " right, title, and interest" therein as the heirs of their father. Even if these are apt words to convey the fractional interest which each heir had individually in the land on the southerly side

of the street, it cannot be held that the phrase was intended to describe distinct shares held by individual heirs on entirely distinct titles.   Admitting that, if Ephraim A. had been the sole grantor, and had used the words " my right, title, and interest," they would have conveyed his entire right, no matter how held or from what source it proceeded, it would not then have appeared that the grantors were seeking to convey that in which they had a mutual interest, as descendants from a common ancestor, which is shown by the deed in question.

The declaration in the deed, that " Ephraim Ingalls died seised of said estate," whether it is to be limited to the tract which had been distinctly defined, or to be extended to the share which the grantors had, as heirs of their father, in the tract lying south of Humphrey Street, cannot be treated as a declaration of seisin of any land not included within the description before given, or extended to a declaration of seisin of an estate which one of the heirs held by an independent title.   It excludes the idea that there was any intent to convey such an estate if it existed.   Nor is the deed an attempt, as suggested in argument, to convey an undivided interest in a limited portion of the property of the tenants · in common.   The description, " the land between said lot and the sea, lying on the southerly side of Humphrey Street," does not refer to a subdivision of the whole tract formed by protracting the side lines of the lot lying northerly thereof, which had been particularly defined. It describes the whole tract which had been left undivided, on the southerly side of the street, and conveys the right which the grantors had therein as the heirs of Ephraim Ingalls.

As we are of opinion that this deed did not convey the one undivided fifth interest which the tenant's ancestor had as devisee of Joseph Ingalls, nor any specific portions thereof, if such existed, as he owned in severalty, the question remains whether any title has been acquired, or whether there has been offered any evidence sufficient to be submitted to the jury, that title in severalty has been acquired by the tenant, by adverse possession, in such portions.

These parcels were known at the trial as the fish-house land, the pump land, and the boat-rack land.   At the argument of this case, it was conceded that as to the boat-rack land there

was not sufficient evidence of adverse possession. The fish-house and pump land constitute but a single parcel, and are so described in the tenant's specification, although parts of it have been differently used. In relying upon an adverse possession of this as giving a title, it is necessary for the tenant to show that it was held adversely to his cotenants by Joseph Ingalls.

The writ in this action is dated August 11, 1883. Joseph Ingalls died on August 24, 1863. Unless, therefore, there was an adverse possession by Joseph Ingalls, at least during the latter portion of his life, there had not been twenty years' adverse possession at the time of action brought.

The evidence, — which shows that Joseph Ingalls built a double boat-house or fish-house in 1854, that he afterwards let it and received the rents, that he paid taxes on the building, but not, *eo nomine*, on the land, together with the evidence tending to show that he built a bank wall round the pump land, — it is contended by the tenant, shows an exclusive appropriation of the parcels by the tenant, which must have been intended to be adverse, and known to be such by his brothers. But it appeared also — nor was this in dispute — that the father of the demandant, as well as other brothers of Joseph, used the fish-house as they found it convenient to do so; and, even if this may have been by permission of the lessees, it shows that they were not ousted from the land, that the pump was used as a common convenience by the neighborhood, and repaired by it, and that the pump land was commonly resorted to for smoking, conversation, and as a place where all might draw up their boats.

" It is the general rule of law," says Mr. Justice Morton, " that the possession of one tenant in common, though exclusive, being consistent with the right of his cotenant, does not amount to a disseisin of the cotenant, and that an ouster, or some act which the law deems equivalent to an ouster, is necessary to constitute a disseisin of his cotenant by a tenant in common." *Bellis* v. *Bellis*, 122 Mass. 414.

The entry of a tenant in common upon the common property, even if he takes the rents, cultivates the land, or cuts the wood and timber without accounting or paying for any share thereof, is not ordinarily to be considered as adverse to his cotenants

and an ouster of them, but in support of the common title. If, with the knowledge of the cotenant, he enters on the land under a claim of exclusive right, if he conveys the same, and there is an entry under such conveyance by his grantee, and if the possession is maintained to the exclusion of the cotenant, this will amount to a disseisin, which, continued for twenty years, will give the disseisor a title by adverse possession. *Bellis* v. *Bellis, ubi supra,* and cases cited. One tenant in common may disseise another, but acts of ownership, which, if done by a stranger, would operate as a disseisin, do not have the same effect if done by a cotenant. They must be done in the assertion of an independent title, inconsistent with that of the cotenant, and be of such character that it is, or must reasonably be held to be, known by those in derogation of whose title they are done that this is so. It has therefore been held, that "an exclusive appropriation of a part of the land to his own use, by the erection of a permanent structure, would be evidence of an ouster of his cotenant." *Bennett* v. *Clemence,* 6 Allen, 10, 18. But in the case at bar the structures erected were light, placed on the ground, and susceptible of easy removal.

The tenant relies on *Lefavour* v. *Homan,* 3 Allen, 354, where it is said that a sole and uninterrupted possession and pernancy of profits by one tenant in common, with the knowledge of the other, continued for a long series of years, without any perception of profits or demand for them by the cotenant, if unexplained or controlled by any evidence tending to show a reason for such neglect or omission, will be evidence of an ouster. There was here no sole possession so long as the brothers of Joseph Ingalls were permitted to use the land and the structures, there being no exclusion of them, except by the fact that there were temporary structures on the land owned by him. But even if possession be sole and with pernancy of profits, this alone, it has been often held, is not evidence of ouster. *Whiting* v. *Dewey,* 15 Pick. 428. *Higbee* v. *Rice,* 5 Mass. 344, 352. *Parker* v. *Locks & Canals,* 3 Met. 91. It is only after this has been continued with the knowledge of the cotenants for a long series of years, that any presumption begins to arise against them. Were it otherwise, the same acts which would be sufficient to acquire a title by possession on behalf of a

stranger would suffice on behalf of a cotenant; and tenants in common would be no further protected against the acquisition of a title by a cotenant, whose entry was rightful and not in its nature adverse, than by a stranger, whose entry was distinctly wrongful.

Reference to the case of *Lefavour* v. *Homan, ubi supra,* and the cases there cited, will show that a much longer possession than that of twenty years was there shown. How long a possession of the character above stated should be, on the part of the cotenant, before any presumption should arise in his favor that it was an assertion of title as against his cotenants, must depend on many circumstances, such as the character of the land itself, of the mode of possession, of its publicity, and of the knowledge which those to be affected by it had, or must be deemed to have had, that it was adverse to them. The acts done should be equivalent to an amotion or ouster, before they can be treated as constituting a disseisin.

Taking all that was done by Joseph Ingalls in connection with the other undisputed evidence, it fails to show any disseisin by him ; and, upon this point, the ruling of the learned judge who presided was correct.

In this view of the possession of Joseph Ingalls, it is unnecessary to consider the acts done by the tenant, or her immediate ancestor, and it must be held that the tenant has failed to establish any title to the specific parcels of land which she has excluded from her disclaimer.

*Judgment for the demandant for four fifths of the demanded premises.*