JAMES G. BOYLE *vs.* GENERAL GMC, INC., & others.[1] No. 01-P-1551. September 23, 2003. *Contract,* Specific performance, Interference with contractual relations, Construction of contract, Performance and breach.

An agreement by which James G. Boyle would acquire truck dealerships and associated assets controlled by Timothy S. Rock broke down. Boyle brought an action alleging breach of contract and asking specific performance. The complaint also had counts that claimed interference with advantageous contractual relationships and, inevitably, violation of G. L. c. 93A. A judge of the Superior Court, who heard the case without a jury, made careful and detailed findings of fact. Much turned on what the parties meant by the term "dealer principal." The judge concluded that the term was synonymous with "dealer operator," a term used by General Motors Corporation (GM) in its standard dealer sales and service agreements. She determined that the plaintiff Boyle had, in effect, attempted to change a fundamental component of the transaction, namely that Rock would have plenary chief executive responsibility for the combined business for a period of two years. Accordingly, she ordered judgment for the defendants on all counts. We affirm.

*Facts.* Rock was the controlling stockholder in GMC, Inc., a truck dealership in Methuen that sold GMC trucks and also handled automotive equipment made by Hino Diesel Trucks USA, Inc.; Mitsubishi Fuso Truck of America, Inc.; Work Horse Custom Chassis, LLC; Allison; and Caterpillar. Boyle, who owned Tuck's Trucks, a GMC dealership in Hudson, wanted to expand the geographic sweep of his operations and opened negotiations with Rock about acquiring the Rock enterprise. After a year of negotiations, assisted by lawyers and accountants, Boyle and Rock executed a detailed purchase and sale agreement on June 8, 1999. The agreement provided for the sale of the assets of GMC, Inc., to Boyle and a ten-year lease of the real property on which GMC, Inc., operated. The owner of that property was a trust of which Rock's brother, Peter Rock, was sole trustee. Boyle was to organize a corporation to acquire those assets, in which Rock would have a ten percent interest. The name of the new business entity that Boyle formed was General GMC, LLC, which we shall call "the new company."

A significant provision of the Boyle-Rock purchase and sale agreement was that the new company would employ Rock as chairman of the board and general manager for two years at $170,000 per year, with the contemplation of an additional two more years of employment by mutual agreement of the new company and Rock. Section 7 of the purchase and sale agreement provided that the ten percent interest of Rock in the new company would be adjusted to satisfy what was required of dealerships by the various manufacturers. In the event, those requirements caused Rock's share to become twenty-five percent. The last two sentences of section 7 read as follows:

> "It is the intent of this provision that Timothy S. Rock shall remain as 'Dealer Principal' during the term of the Employment Agreement or any extension thereof . . . . Upon termination of said Employment,

---

[1] Timothy S. Rock and Peter M. Rock, trustee of Bentley Realty Trust.

Seller's interest in Buyer's operating entity shall be transferred to Buyer without consideration."

Section 9 of the purchase and sale agreement provided for a consulting and noncompetition agreement under which Rock was to consult to the new company and be paid $400,000 in monthly installments over a period of thirty-six months.

Papers submitted to GM by the new company, at least through December 1999, identified Rock as "dealer operator." In January 2000, Boyle learned that if Rock were the "dealer operator," then he, Boyle, would not have direct rights to return parts to GM. Boyle's lawyer dispatched a letter to Rock's lawyer stating that the purchase and sale agreement needed to be amended to remove the requirement that Rock have an interest in the new company, to amend the stock ownership schedule of the new company, and to delete the reference to Rock as "dealer principal" and substitute the term "executive manager." These matters, Boyle's lawyer wrote, were essentially formalism and did not alter the essence of the deal. Rock thought otherwise. A flow of self-serving letters by counsel and by the parties themselves followed. These came to an end when new counsel for Boyle sent a c. 93A letter to Rock and Peter M. Rock.

*Discussion.* We are persuaded by a review of the record, which includes executed contracts, drafts, and correspondence, that there was ample basis for the judge to conclude that the two-year control position of Rock was a fundamental aspect of the original transaction.

Boyle's position on appeal is that the term "dealer principal" is unambiguous and means something other than the control and business interest attributable to the phrase "dealer operator." If that were so, it is hard to understand why Boyle demanded that the purchase and sale agreement be amended by striking out the provisions that designated Rock as dealer principal for at least two years and provided that he should have shares of stock in the new company sufficient to qualify with the vehicle manufacturers as a "dealer operator." The term "dealer principal" as used in the agreement was not defined and is not self-defining, except with reference to the intentions manifested by the parties and to usage in the automotive industry. See *Clark v. State St. Trust Co.*, 270 Mass. 140, 151-152 (1930); *Kobayashi v. Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 496-497 (1997); *Joseph Francese, Inc. v. DOS Concrete Servs., Inc.*, 47 Mass. App. Ct. 367, 369 (1999). Here, the nature of the transaction intended by the parties is apparent from the primary documents themselves, which provide for Rock's two-year control position. Deletion of the provisions that dealt with that were major changes, particularly as the $400,000 (in the form of a consultation contract) that Rock was to receive for the good will value of the business was to be paid over three years. Rock, an experienced and successful dealer, had excellent reason for being in a control position at the new company during at least two-thirds of that pay-out period.

As Boyle declined to perform the purchase and sale agreement as written, he was in no position to claim a breach of contract. *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. 509, 519-520 (1998), cert. denied, 525 U.S. 1177 (1999).

In accordance with the motion made in their brief, the defendants may have

double costs and counsel fees attendant to the appeal. Mass.R.A.P. 25, as amended, 378 Mass. 925 (1979). See *Allen* v. *Batchelder*, 17 Mass. App. Ct. 453, 457-458 (1984). As to the amounts of those costs and fees, the defendants shall submit a petition for counsel fees and costs with the necessary back-up as prescribed in *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 20 (1989).

*Judgment affirmed.*

*John J. Kuzinevich* for the plaintiff.
*Barry Y. Weiner* for the defendants.